CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 20 2016

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ISRAEL RAY COOPER, | ) | CASE NO. 7:15CV00522 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| WARDEN E. BARKSDALE, ET AL., | ) | By: Hon. Glen E. Conrad |
| | ) | Chief United States District Judge |
| Defendants. | ) | |

Israel Ray Cooper, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983. Cooper alleges that the defendant prison officials assaulted him, failed to provide medical care, or failed to protect him from verbal harassment and other adverse actions in retaliation for his reports of sexual abuse, all in violation of his constitutional rights and the Prison Rape Elimination Act ("PREA").[1] Upon review of the record, the court finds that the defendants' motion for summary judgment must be granted on the ground that Cooper failed to exhaust available administrative remedies.

I.

Cooper is incarcerated at Red Onion State Prison ("Red Onion"), a high security facility in Pound, Virginia, operated by the Virginia Department of Corrections ("VDOC") where the alleged violations occurred. In his verified amended complaint, Cooper sues the following Red Onion officials: Warden Earl Barksdale, W. Swiney, Tory Raiford, A. Galihar, Capt. Still,

---

[1] PREA is a federal statute enacted for several stated purposes that include establishing a zero-tolerance policy for prison rape, developing national standards for punishing perpetrators of prison rape, and increasing accountability for prison officials to prevent it. 42 U.S.C. §§ 15602-15609.

Investigator Bentley, Lt. Garry Adams, Lt. Kiser, Sgt. Hall, Sgt. Fleming, R. Kegley, C/O S. Taylor, and C/O Skylar White. As relief, Cooper seeks monetary and injunctive relief.[2]

After 55 paragraphs of factual allegations, Cooper's amended complaint asserts four, unnumbered "LEGAL CLAIMS" that incorporate these facts. For ease of reference, the court has separated the factual allegations according to the claims to which they relate.

Claim 1: Excessive force

On March 23, 2015, "over an issue of a broken razor [Cooper] had on his cell table," Defendants Lt. Adams and Officer White took Cooper to Adams' office, where they exposed tattoos on his body,[3] called him "faggot, child molester, cocksucker," and took turns punching him in the chest. (Am. Compl. 6, ECF No. 22.) Cooper says he made a PREA hotline call to report this incident. Cooper asserts that the officers' actions violated his rights under the Eighth Amendment.

Claim 2: Excessive force and denial of medical care

On April 12, 2015, after Officer S. Taylor found a magazine photograph of Selena Gomez in Cooper's cell, Sgt. Hall had Cooper brought to the lieutenant's office, called him a "cocksucking child molester," and then slapped Cooper's left ear with a cupped hand, causing permanent hearing loss. (Id. 7.) Cooper's requests for medical attention went unanswered. Cooper says he made a PREA call to report this incident, and officers failed to follow VDOC

---

[2] The amended complaint also seeks preliminary injunctive relief, but the court has previously denied such relief.

[3] Cooper alleges that to ensure his assignment to a protective custody unit, he has allegedly tattooed himself with symbols suggesting that he is a "pedophile and child molester," although he has not been convicted of any such crime. (Am. Compl. 5.)

2

PREA protocols for investigation and separation of Sgt. Hall from Cooper's area. Cooper asserts that the assault and denial of medical care for his hearing loss violated his rights under the Eighth Amendment.

Claim 3: Excessive force

On October 7, 2015, White told Cooper to "shut up child molester and suck my dick." (Id. 13.) Cooper filed an emergency grievance stating that White's conduct constituted "sexual advances," but White threw the document to another officer and cuffed and shackled Cooper to move him to another cell. Rather than enter the new cell, Cooper balled himself up on the floor. White, Adams, and Taylor then picked Cooper up and threw him into the cell. White also "attempted to punch Cooper in his testicles," and "they then stomped Cooper's legs and feet, slammed the door on his feet numerous times, then used a 'leash' attached to the cuffs to yank Cooper backwards off the floor and thr[ough] the tray slot and feed box." (Id. 14.) These actions "caus[ed] severe damage that scarred Cooper's arms," and a nurse provided treatment. (Id.) Officials then brought seven false disciplinary charges against Cooper related to this incident, one alleging that "Cooper caused his own injuries with his fingernails." (Id.) Cooper asserts that the officers' assaultive actions violated his rights under the Eighth Amendment.

Claim 4: Supervisory failure to protect Cooper's rights

Between March 23 and October 18, 2015, many supervisory defendants deliberately "fail[ed] to protect Cooper from a long series of sexual harassment" and "allowed those officials under their command to continue to violate" Cooper's constitutional rights to due process and

3

equal protection and his rights under PREA. (Id. 16-17.) In addition to the incidents described in Claims 1-3, Cooper alleges numerous other events in support of Claim 4, as follows.

In March or April 2015, White threatened to take Cooper and his cell mate, Dalton McCray, to a utility closet and stick broom sticks in their anuses if McCray did not withdraw a grievance Cooper had helped him file about White. McCray withdrew his grievance and later made a PREA report about White's threat, but the investigator believed the officer's story. On May 4, 2015, Lt. Adams and Tori Raiford separated Cooper and McCray by moving Cooper to a cell with Richard Dunn, an inmate serving a life sentence who hates sex offenders. White allegedly told Dunn to "handle that child molester and I'll have you out in two weeks," and told Cooper other "hate words that caused much distress." (Id. 9.)

On May 20, 2015, White falsified documents when charging Cooper for self-tattooing,[4] and Cooper placed a PREA call to report this incident as an act of retaliation for his prior PREA reports about White. On May 26, 2015, Lt. Adams told Cooper he was moving to the mental health behavioral modification pod because of PREA calls Cooper had made about Adams, White, and Hall. Adams said Cooper would not move back to the protective custody unit unless he withdrew the PREA complaints. In the modification pod, Lt. Kiser, Sgt. Fleming, and Unit Manager Swiney told Cooper that he would be beaten and starved if he did not withdraw all PREA complaints and grievances.

One day, Cooper "cut [him]self on his arm to activate a camera and he documented on video what these people had threatened him with." (Id. 10.) Then, unspecified officers placed him in five-point restraints and "sprayed him with gas and pepper spray." (Id.)

---

[4] Cooper states that White lied on the disciplinary charge for tattooing by stating that he saw Cooper "doing it, and flushed the needle"; Cooper claims that the tattoos White charged him for "were 5 days old and were not even bleeding" on May 20, when White wrote the charge. (Id. 9-10.)

4

On May 28, 2015, Cooper signed a prepared statement "to withdraw all complaints," but he told Investigator Bentley that he did so "under duress." (Id.) On June 1, 2015, Cooper "under duress withdrew" two other PREA complaints about White, and Swiney moved him out of the modification pod. In May and June 2015, Swiney falsely wrote on disciplinary reports that Cooper had accepted penalty offers for some disciplinary charges. In June 2015, Capt. Still concluded the investigation of Cooper's April 12, 2015, PREA complaint and deemed it to be unfounded. Cooper says this protocol was not consistent with VDOC PREA rules that do not allow an officer to investigate a claim involving that officer.

On August 20, 2015, Cooper reported to Officer S. Taylor that his cell partner had a weapon hidden in his mattress. Taylor and another officer entered the cell and left "empty-handed," but Cooper and his cell mate were later both charged and convicted with a disciplinary infraction for possessing the weapon. (Id. 12.)

On September 20, 2015, White told Cooper that Lt. Adams had threatened Cooper. White then "made sexual comments" and called Cooper a "cocksucker," and Cooper placed a PREA call and "reported everything written in this action." (Id. 13) On September 25, 2015, Cooper filed an emergency grievance about the assaults in March and April, the officers' forcing him to withdraw complaints, and the inadequate PREA investigation. Galihar deemed Cooper's allegations on this document to be a nonemergency, thus placing Cooper in "even further danger at the defendants' hands." (Id. 13.) On August 31, 2015, R. Kegley violated prison policy when she served classification papers on Cooper, performed an ICA hearing herself, did not give Cooper an opportunity to speak to the ICA chairman, and did not provide Cooper his copy of the ICA hearing so he could appeal, in violation of his due process rights. Cooper filed request forms notifying Raiford of Kegley's violations, but Raiford did not correct these errors.

5

Defendants have filed a motion for summary judgment on the ground that Cooper failed to exhaust available administrative remedies before filing this lawsuit, as required under 42 U.S.C. § 1997e(a). Cooper has responded, making the matter ripe for disposition of defendants' motion.

## II.

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

The Prison Litigation Reform Act ("PLRA"), among other things, provides in 42 U.S.C. § 1997e(a) that a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. This exhaustion requirement is "mandatory." Ross v. Blake, __U.S.__, 136 S. Ct. 1850, 1856 (2016). It "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the facility provides to prisoners and meet all deadlines within that procedure before filing his § 1983 action. See Woodford v. Ngo, 548 U.S. 81, 90-94 (2006) (finding inmate's untimely

6

grievance was not "proper exhaustion" of available administrative remedies under § 1997e(a)). Regardless of whether the particular form of relief the inmate desires is available under the administrative procedure, he must, nevertheless, exhaust properly all available remedies under that procedure before bringing a civil action in this court. Porter, 534 U.S. at 524.

The defendants bear the burden of proving the affirmative defense that Cooper failed to exhaust available administrative remedies regarding his claims before filing suit. Jones v. Bock, 549 U.S. 199, 212 (2007). Once they have done so, Cooper may yet escape summary judgment under § 1997e(a) if he states facts showing that the remedies under the established grievance procedure were not "available" to him. Ross, 136 S. Ct. at 1859 (noting that circumstances making prison grievance procedures unavailable "will not often arise"). Generally, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Operating Procedure ("OP") 866.1 is the established administrative remedies procedure for inmates in VDOC facilities and, thus, it is the procedure they must follow to comply with § 1997e(a). Inmates are oriented to the steps of this procedure each time they are transferred to a new prison facility.[5] Under OP 866.1, an inmate with a grievance about some event or issue must first make a good faith effort to resolve his concerns informally. He must normally document this informal resolution effort by completing an informal complaint form and submitting it to prison staff, who will log his submission on the computer and issue him a receipt. Prison staff will then provide the inmate with a written response on the bottom of the informal complaint form and return it to him within fifteen days. The inmate can then initiate the

---

[5] All issues are grievable except those pertaining to the Virginia Parole Board, court decisions, state and federal laws and regulations, and other matters beyond VDOC control, or related to disciplinary hearing decisions or procedural errors that may be appealed under a separate procedure.

7

next step under OP 866.1—a regular grievance, with the informal complaint attached. If the inmate does not receive a response to his informal complaint within 15 days, he may, nevertheless, file a regular grievance form, attaching his receipt as evidence that he filed an informal complaint.

A regular grievance must be filed within 30 days of the occurrence about which it complains. Only one issue may be addressed per grievance. The regular grievance form itself instructs the inmate to submit a completed form "through the institutional mail to the Warden/Superintendent's office." (See, e.g., Messer Affid. Encl. B, at 19, ECF No. 46-1.) If a regular grievance is properly and timely filed, the warden or his designee will investigate and send the inmate a Level I response. If the responding official determines the grievance to be "unfounded," for full exhaustion, the inmate must appeal that holding to Level II, the regional administrator, and in some cases, to Level III.[6] Expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal to the next level of review.

An emergency grievance is not a step toward exhaustion of the remedy procedures in OP 866.1. As the emergency grievance form states, inmates can use such a form to seek "expedited staff responses to allegations that an [inmate] is subject to a substantial risk of imminent sexual abuse and to situations or conditions which may subject the [inmate] to immediate risk of serious personal injury or irreparable harm." (See, e.g., id., at 23.)

In their motion for summary judgment, the defendants contend that Cooper's § 1983 complaint must be dismissed under § 1997e(a), because he failed to exhaust administrative remedies before filing this action. They submit evidence that Cooper has never filed any

---

[6] The time limit for issuing a Level I response is 30 days, a Level II response is 20 days, and a Level III response (if available) is 20 days.

informal complaint forms or regular grievances about any of the incidents identified in his claims for relief.

Defendants state that Cooper filed two PREA regular grievances related to his § 1983 case. OP 866.1 provides that an inmate "alleging sexual abuse may submit a grievance without submitting it to a staff member who is the subject of the complaint," and such a grievance will not be "referred to a staff member who is the subject of the complaint." (OP 866.1(IV)(C)(3).) The two PREA regular grievances that Cooper filed to the grievance department were: (a) No. 00226, dated May 8, 2015, alleging that after White told Cooper and McCray on May 2, 2015, not to file any more complaints about him, Cooper was moved on May 4, 2015, to another cell with Inmate Dunn; and (b) No. 00233, dated May 21, 2015, alleging that earlier that same day, White had allegedly falsely charged Cooper with attempting to assault White. Cooper has alleged that both of these events occurred in retaliation for his PREA calls and grievances. Cooper withdrew both of these PREA grievances, so no one responded to them.

The defendants also offer evidence that Cooper filed "PREA" emergency grievances that were returned to him because the incidents stated on them did not meet the definition of an emergency: (c) No. 003361, dated May 22, 2015, alleging that Cooper had been placed in segregation in retaliation for his PREA complaints; (d) No. 002260, dated September 25, 2015, alleging that Swiney had forced Cooper to withdraw three PREA complaints about prior assaults; and (e) No. 0002263, dated October 5, 2015, alleging that PREA authorities had been notified of three incidents in which officers had assaulted and sexually abused him, but officers had told him

9

he would be beaten and starved if he did not withdraw all PREA complaints and grievances. (See Messer Affid. Encl. C, at 22-26, ECF No. 46-1.)[7]

Cooper admits that he has never filed informal complaints or regular grievances about the claims in his § 1983 complaint. Rather, he contends that he tried to exhaust using PREA reports and PREA regular grievances. He alleges that he made PREA telephone calls to report the alleged assault incidents on March 23 and April 12, 2015, within days of these incidents, but was "forced" to withdraw all his PREA complaints on June 1, 2015. Cooper also submits a purported copy of a PREA regular grievance with five additional pages attached—dated October 5, 2015, describing the March and April assaults and many other incidents of alleged sexual harassment and retaliation for his PREA reports. (Amend. Compl. Ex. D2, at 32-37, ECF No. 22-3.) Cooper states that he mailed this PREA regular grievance and attachments to the warden and the VDOC director, asking them to ensure that it received a tracking number and was appropriately processed. Cooper never received a receipt or response.

Cooper also submits a purported PREA regular grievance, dated October 8, 2015, describing the October 7, 2015, altercation with White, Adams, and Taylor after Cooper refused to go into his cell. Cooper states that he handed a copy of this document to an internal investigator, but never received a receipt or a response. Finally, Cooper submits a purported copy of a PREA regular grievance dated October 18, 2015, complaining about the October 7 incident and being forced to withdraw PREA complaints in late May and early June 2015.

---

[7] The defendants have submitted two copies of Cooper's "PREA" emergency grievance No. 0002263—one copy signed by Sgt. Owens, stating: "You are housed in a safe and secure environment. PREA coordinator has been notified"; and the other copy signed by another officer, noting that the document had been referred for investigation as a PREA incident report of sexual abuse or harassment. (Messer Affid. Encl. C. at 24-26, ECF No. 46-1.) Cooper claims that the defendants manufactured the second copy of his emergency grievance and have presented it as a fraud upon the court, entitling him to summary judgment. The court finds no indication of fraud here, and certainly finds no ground for summary judgment in Cooper's favor. Therefore, Cooper's motion for summary judgment will be denied.

10

According to Cooper, he paid the postage to mail this PREA regular grievance to the Red Onion grievance coordinator, and has a receipt for the postage, but never received a response or a receipt indicating that his mailing had been received. Cooper further claims that he sent copies of this grievance to the PREA investigator, the warden, and the director of the VDOC, but never received a receipt or a response.[8] Cooper also alleges filing emergency grievances related to his claims, and officers determined all of them to be non-emergencies.

The steps Cooper describes do not constitute exhaustion of the VDOC's established inmate grievance procedures as to his § 1983 claims. OP 866.1 does not provide for inmates to substitute a PREA telephone report in place of an informal complaint or a regular grievance. Cooper does not allege that he ever attempted to file informal complaints about the alleged assaults in March and April 2015, with a timely regular grievance to follow within 30 days of each incident. Instead, Cooper attempted his own methods of presenting his complaints: by making PREA phone calls in March and April, and then by mailing PREA regular grievances to various officials in October 2015, well after the 30-day filing period for informal complaints and regular grievances had expired.

Cooper argues that officials made PREA regular grievances unavailable to him in May and June 2015, by threatening to harm him if he did not withdraw some such documents he had filed about the alleged assaults and retaliation. He also points to his emergency grievances as evidence of attempted exhaustion. Even accepting as true his allegation that officials would not allow him to pursue his complaints on these matters as PREA grievances and that they rejected

---

[8] In an inmate request form allegedly mailed with this PREA grievance, Cooper states: "I have sent numerous requests to your offices to which I've gotten no reply. Also no less than 5 grievances styled in the same manner. I've also informed you that the building supervisors will not issue informal complaints. . . . [Y]ou are now served with this grievance. . . ." (Id. Ex. AA, at 23-26.)

11

many emergency grievances as non-emergency matters, Cooper does not state facts showing that these actions made the regular administrative remedies set forth in OP 866.1 <u>unavailable</u> to him.

Cooper also does not describe following the instructions in OP 866.1 to deliver his PREA regular grievances to the appropriate officer. Instead of using the institutional mailing system to send his administrative remedies to the warden's office as the grievance form itself instructs, Cooper alleges that he hand-delivered his PREA regular grievances to other officials or sent them by regular mail to the warden or other administrators. This self-designed system of attempting to register complaints or grievances in the form and manner Cooper chose simply does not satisfy the mandatory requirement in § 1997e(a) that he exhaust the <u>available</u> administrative remedies system that the prison provided and follow its steps and deadlines. Cooper does not describe ever attempting to obtain or prepare a regular grievance or informal complaint about any of the incidents at issue in the amended complaint, nor does he describe submitting any of his completed remedy forms through the institutional mail directed to the warden's office, as the established policy provides.

Based on the foregoing, the court concludes that Cooper has presented no disputed issue of fact on which he could prove that he properly exhausted available administrative remedies as to any of the constitutional violations alleged in his amended complaint. More to the point, he fails to forecast evidence to establish that the normal steps in the OP 866.1 grievance procedures were unavailable to him in any way or that officials' actions made these established grievance procedures unavailable to him through their actions. Accordingly, the court will grant the defendants' motion for summary judgment under § 1997e(a) for failure to exhaust available administrative remedies and will dismiss Cooper's claims without prejudice.

## III.

For the reasons stated, the court will grant defendants' motion for summary judgment on the ground that Cooper failed to exhaust administrative remedies before filing this action; dismiss Cooper's claims without prejudice; and deny Cooper's motions for summary judgment (ECF No. 49) as without merit. An appropriate order will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER: This 20th day of September, 2016.

*/s/ Glen Conrad*
Chief United States District Judge